**FILED**

LAI

MAY - 4 2007
5-4-07
**MICHAEL W. DOBBINS**
**CLERK, U.S. DISTRICT COURT**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GARY MOAD, and LAUREL MOAD,<br>Individually and on behalf of all others similarly<br>situated<br><br>Plaintiffs,<br><br>v.<br><br>ATLAS VAN LINES, INC., ATLAS WORLD<br>GROUP, INC., ALLIED VAN LINES, INC.,<br>NORTH AMERICAN VAN LINES, INC.,<br>SIRVA, INC., SIRVA WORLD WIDE, INC.,<br>MAYFLOWER TRANSIT, LLC, UNITED VAN<br>LINES, LLC, UNIGROUP, INC, BEKINS VAN<br>LINES, LLC, WHEATON VAN LINES, INC.,<br>AMERICAN MOVING AND STORAGE<br>ASSOCIATION, INC. AND JOHN DOES I-X,<br><br>Defendants. | 07cv2506<br>JUDGE GETTLEMAN<br>MAGISTRATE JUDGE DENLOW<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br><br>**DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Plaintiffs, on behalf of themselves and all others similarly situated, pursuant to Rule 23 of the Federal Rules of Civil Procedure, by and through their undersigned Counsel of Record, complain and allege, upon information and belief, except as to those paragraphs applicable to the named Plaintiffs, which are based on personal knowledge, as follows:

## NATURE OF THE ACTION

1. Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on their own behalf and on behalf of a class (the "Class") of similarly situated entities and individuals that purchased "Household Goods Moving Services" from Defendants or any of

1

their subsidiaries, during the period January 2002 through the present, and were overcharged as a result of Defendants having artificially inflated, fixed, fraudulently misrepresented, and/or otherwise set and manipulated an illegal Fuel Surcharge. Defendants' knowing, intentional, and illegal scheme perpetrated against Plaintiffs and the Class, to misrepresent, fix, and inflate the cost of "Fuel Surcharges," resulted in Defendants collecting hundreds of millions of dollars in profits that are being falsely represented to Plaintiff and the Class as "costs."

2.      At all relevant times herein, Defendants conspired to charge "Fuel Surcharges" to customers in the United States who purchased Household Goods Moving Services for interstate moves. As further alleged herein, during at least the period January 2002 to the filing of this action (the "Class Period"), Defendants agreed, combined, and conspired with each other to misrepresent, contrive, fix, peg, raise, maintain, and/or stabilize illegal "Fuel Surcharges." As a result of Defendants' unlawful conduct and conspiracy, Plaintiffs and the other members of the Class paid artificially high and unlawful "Fuel Surcharges" and have been damaged thereby.

3.      This action arises from Defendants' shocking and unlawful conspiracy to inflate, fix, peg, raise, maintain, and/or fraudulently misrepresent prices for "Fuel Surcharges" by Defendants, individually and through their agents ("Carriers"), charged to Plaintiffs and the Class, who purchased "Household Goods Moving Services" from Defendants, in violation of the federal Racketeering Influenced Corrupt Organizations Act, violations of 18 U.S.C. §1962(c) and (d) ("RICO"), antitrust laws of the United States, Section 1 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 1 ("Sherman Act") and Section 4 of the Clayton Antitrust Act of 1914, 15 U.S.C. § 15 ("Clayton Act"), the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et.al., as well as for recovery pursuant to Section 14704 of the ICC Termination Act of 1995, 49  U.S.C. § 14704 ("ICCTA") of unreasonable, excessive, and unlawful rates

2

charged by Defendants.

4.     As a direct and proximate result of the Defendants' illegal and unjust actions as described herein, Plaintiffs and the Class have suffered damages.

5.     Defendants jointly and collectively, in Illinois and throughout the United States, profited from these unlawful rate adjustments designated as "Fuel Surcharges" in amounts totaling hundreds of millions of dollars, representing the difference between the actual cost attributable to the increase in their cost of fuel and the amounts they have unlawfully charged consumers.

## JURISDICTION AND VENUE

6.     This Court has original federal question jurisdiction over this matter. This Complaint is brought against Defendants under RICO, Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and the costs of this suit, including reasonable attorney's fees, for the damages sustained by Plaintiffs and the members of the Class by reason of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, as well as under 49 U.S.C. § 14704 of the ICCTA to recover amounts paid by Plaintiffs in excess of rates contained in Defendants' published tariff.

7.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, 18 U.S.C. §§1961, 1962, 1964, Sections 4(a) and 15 of the Clayton Act, 15 U.S.C. §§ 15(a), and Section 14704(c)(1) of the ICCTA, 49 U.S.C. § 14704(c)(1).     Supplemental jurisdiction over Plaintiffs' state law claim is conferred by 28 U.S.C, § 1367 (a).

8.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. §§1332(d).

9.     This Court has *in personam* jurisdiction over each of the Defendants, as each was engaged in RICO violations, committed RICO predicate acts, was involved in a RICO conspiracy, engaged in an illegal price-fixing scheme and conspiracy that was directed at and/or caused damages to persons and entities residing in, located in, or doing business throughout the United States including the Northern District of Illinois.

10.     Venue is proper in this judicial district pursuant to 15 U.S.C. § 22, 18 U.S.C. §1965(a), and 28 U.S.C. § 1391(b) and (c) because during the Class Period Defendants resided, transacted business, were found, or had agents in this district, and because a substantial part of the events giving rise to Plaintiffs' claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in the Northern District of Illinois.

11.     No other forum would be more convenient for the parties and witnesses to litigate this action.

## PARTIES

12.     Plaintiffs Gary and Laurel Moad reside at 2968 Langston Circle, St. Charles, Illinois 60174 and are citizens and residents of the State of Illinois, in the Northern District of Illinois. Plaintiff purchased moving and storage services from the Defendant Atlas Van Lines, Inc., and paid the "fuel surcharge" set by the unlawful actions of all Defendants.

13.     Defendant Atlas Van Lines, Inc. ("Atlas") is a corporation organized pursuant to the laws of Delaware with its principal place of business in Evansville, Indiana. Atlas is a wholly owned subsidiary of Atlas World Group, Inc. Atlas provides interstate transportation of Household Goods throughout the United States. Atlas is a member of the American Moving and Storage Association, Inc. ("AMSA") and is a member of AMSA's Certified Moving Program.

4

Mike L. Shaffer, Chairman and Chief Executive Officer of Atlas, is an officer of AMSA. Marian Weilert Sauvey, General Counsel, Senior Vice President and Secretary of Atlas, is Chairman of the AMSA Legal Advisory Council.

14.     Defendant Atlas World Group, Inc. ("Atlas World Group") is a corporation organized pursuant to the laws of Delaware with its principal place of business is Evansville, Indiana. Atlas World Group is the parent corporation of Atlas. Through its subsidiary Atlas, Atlas World Group provides interstate transportation of Household Goods throughout the United States. Mike L. Shaffer, Chairman and Chief Executive Officer of Atlas World Group, is an officer of AMSA. Marian Weilert Sauvey, General Counsel, Senior Vice President and Secretary of Atlas World Group, is Chairman of the AMSA Legal Advisory Council.

15.     Defendant Allied Van Lines, Inc. ("Allied") is a corporation organized pursuant to the laws of Delaware with its principal place of business in Westmont, Illinois. Allied is a wholly owned subsidiary of North American Van Lines, Inc. Allied provides interstate transportation of Household Goods throughout the United States. Allied is a member of AMSA and is a member of AMSA's Certified Moving Program.

16.     Defendant North American Van Lines, Inc. ("North American") is a corporation organized pursuant to the laws of Delaware with its principal place of business in Fort Wayne, Indiana. North American is the parent corporation of Allied and is a wholly owned subsidiary of SIRVA Worldwide, Inc. North American provides interstate transportation of Household Goods throughout the United States. North American is a member of AMSA and is a member of AMSA's Certified Moving Program.

5

17. Defendant SIRVA, Inc. ("SIRVA") is a corporation organized pursuant to the laws of Delaware with its principal place of business in Westmont, Illinois. SIRVA, Inc. is a parent corporation of SIRVA Worldwide, Inc.

18. Defendant SIRVA Worldwide, Inc. ("SIRVA Worldwide") is a corporation organized pursuant to the laws of Delaware with its principal place of business in Westmont, Illinois. SIRVA Worldwide is the parent corporation of North American, which is the parent corporation of Allied. Through its subsidiaries, North American and Allied, SIRVA Worldwide provides interstate transportation of Household Goods throughout the United States and participates in and benefits from all decisions made by AMSA and its members.

19. Defendant Mayflower Transit, LLC ("Mayflower") is a limited liability company organized pursuant to the laws of the State of Missouri with its principal place of business in Fenton, Missouri. Mayflower is a wholly owned subsidiary of UniGroup, Inc. and an affiliate of United Van Lines, LLC. Mayflower provides interstate transportation of Household Goods throughout the United States. Mayflower is a member of AMSA and is a member of AMSA's Certified Moving Program. Pat Larch, President and Chief Operating Officer of Mayflower, serves on the executive committee of AMSA and is Chairman of the Household Goods Carriers Bureau.

20. Defendant United Van Lines, LLC ("United") is a limited liability company organized pursuant to the laws of Missouri with its principal place of business in Fenton, Missouri. United is a wholly owned subsidiary of Unigroup, Inc. and an affiliate of Mayflower. United provides interstate transportation of Household Goods throughout the United States. United is a member of AMSA and is a member of AMSA's Certified Moving Program. Pat

6

Larch, President and Chief Operating Officer of United, serves on the executive committee of AMSA and is Chairman of the Household Goods Carriers Bureau.

21. Defendant Unigroup, Inc. ("Unigroup") is a corporation organized pursuant to the laws of Missouri with its principal place of business in Fenton, Missouri. Unigroup is the parent corporation of Mayflower and United. Through its subsidiaries Mayflower and United, Unigroup provides interstate transportation of Household Goods throughout the United States. Gerry Stadler, Chairman and Chief Executive Officer of Unigroup, serves on the board of AMSA.

22. Defendant Bekins Van Lines, LLC. ("Bekins") is a limited liability company organized pursuant to the laws of the State of Delaware and provides interstate transportation of Household Goods throughout the United States. Bekins participates in and benefits from all decisions made by AMSA and its members.

23. Defendant Wheaton Van Lines, Inc. ("Wheaton") is a corporation organized pursuant to the laws of the State of Indiana and provides interstate transportation of Household Goods throughout the United States. Wheaton participates in and benefits from all decisions made by AMSA and its members.

24. Defendant American Moving and Storage Association, Inc. is a corporation organized pursuant to the laws of the State of Virginia with its headquarters located in Alexandria, Virginia, organized for purposes of, *inter alia*, providing a mechanism to the other Defendants to unlawfully conspire to unlawfully fix, peg, raise, maintain and/or stabilize prices for "Fuel Surcharges."

## UNNAMED CO-CONSPIRATORS

25. On information and belief, at all relevant times, other Household Goods Carriers, trade groups, or other entities, referred to herein as John Does I-X, and each of whom was a

7

member of AMSA at all times material hereto, willingly conspired with Defendants in their fraudulent, illegal, and deceptive actions, including but not limited to, price-fixing, RICO violations, and unlawful restraint of trade. All averments herein against named Defendants are also averred against these unnamed co-conspirators as though set forth at length.

## DEFENDANTS' AGENTS

26.     The acts alleged to have been done by Defendants were authorized, ordered or done by their directors, officers, agents, employees, subsidiaries, or representatives while actively engaged in the management of each of the Defendants' affairs, on behalf of and for the benefit of Defendants, as co-conspirators, and against Plaintiffs' class, each of whom were direct purchasers of the services set forth herein.

27.     Each of the Defendants acted for itself and by and through its local agents, who transport goods for it and under its name. As such, each Defendant is responsible for all acts or omissions of any of its agents which relate to the performance of household goods transportation services which are within the actual or apparent authority of the agent from the carrier or which are ratified by the carrier pursuant to 49 U.S.C. § 13907. The acts complained of herein have been within the apparent authority of the Defendants, have been to their benefit, and have been ratified by Defendants.

## RICO ALLEGATIONS

28.     Each Defendant is a "person" within the meaning of 18 U.S.C. §1961(3).

29.     Based upon Plaintiffs' current knowledge, the following persons constitute a group of individuals associated in fact that Plaintiffs refer to as the "Enterprise": (1) Wheaton; (2) Bekins; (3) Unigroup; (4) United; (5) Mayflower; (6) SIRVA Worldwide; (7) North American; (8) Allied; (9) Atlas; (10) Altas World Group; (11) AMSA; and (12) other unnamed

co-conspirator Defendants that agreed to and engaged in the unlawful actions described herein to artificially inflate the fuel charge costs charged to Plaintiffs and deliberately engaged in conduct designed to hide hundreds of millions of dollars in profits that are being falsely represented as "costs."

30.     The Enterprise is an ongoing organization which engages in, and whose activities affect, interstate commerce.  The members of the Enterprise function as a continuing unit as described below and share the common purpose of maximizing their profits by artificially inflating, fraudulently representing, and illegally charging false and inflated fuel charges to Plaintiffs.

31.     While each Defendant participates in and is a member and part of the Enterprise, it also has an existence separate and distinct from the Enterprise.

32.     In order to successfully overcharge plaintiffs and the class in the manner set forth above, Defendants needed a system that would allow Defendants to demonstrate that their stated fuel cost was an "industry average."  The Enterprise provides Defendants with that system. Defendants control and operate the Enterprise as follows:

a.     Defendants deliberately and knowingly meet and conspire to adjust their rates for fuel surcharges in a manner calculated to disguise profits as cost increases that should have been, but in this instance were not, reflective of rising "industry average carrier costs" for diesel fuel.

b.     Defendants conspired to and engaged in a practice of calculating and charging a rate greatly in excess of "industry average carrier costs," all as prohibited by 49 U.S.C. § 13701;

9

c.     Defendants entered into side agreement and concealed it from the shipping public and the STB;

d.     Defendants conspired to and promulgated a tariff, known as Tariff 400-N, which each Defendant is required to publish and observe, and make available for inspection by potential customers;

e.     In order to facilitate their illegal scheme, Defendants published one "Fuel Surcharge" in Tariff 400-N for the public and the STB, and colluded, conspired and engaged in a practice to charge a different "Fuel Surcharge" pursuant to the scheme set forth herein, which resulted in millions of dollars of additional charges to Plaintiffs and the Class;

f.     Utilizing AMSA, the exclusive trade association for the Moving and Storage industry, to publish inflated tariffs, implement their illegal Tariff 400-N scheme through the AMSA members, and adopt/implement guidelines that all of its members agree to be bound by, and otherwise using AMSA to effectuate its scheme to defraud, inflate, and overcharge Plaintiffs and the Class illegal "Fuel Surcharges"; and

g.     AMSA was aware of the "Fuel Surcharge" conspiracy, and participated in, coordinated, facilitated, and/or ratified the conspiracy and the illegal acts of the Household Goods Carrier Defendants as averred herein.

33.     As set forth above, the Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants engage.

## Predicate Acts

34.     Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. §1341 (relating to mail fraud) and 18 U.S.C. §1343 (relating to wire fraud). As set forth below, Defendants have and continue to engage in conduct violating each of

these laws to effectuate their scheme.

35. For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations or promises Defendants, in violation of 18 U.S.C. §1341, placed in post offices and/or in authorized repositories matter and things to be sent or delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carrier, and received matter and things from the Postal Service or commercial interstate carriers, including but not limited to contracts, invoices, correspondence, and payments.

36. For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations or promises, Defendants, also in violation of 18 U.S.C. §1343, transmitted and received by wire, matter and things which include but are not limited to contracts, invoices, correspondence, Order for Service, Estimates, and payments.

37. The matter and things sent by Defendants via the Postal Service, commercial carrier, wire or other interstate electronic media include, *inter alia*:

     a.     contracts containing false and fraudulent misrepresentations of the fuel surcharge;

     b.     invoices that falsely containing the fraudulently misrepresented and inflated fuel surcharge; and

     c.     other communications, estimates, orders, and documents representing, publishing, setting, communicating, and/or related to the unlawful, fraudulent, and inflated fuel surcharges.

38. Other matters and things sent through or received from the Postal Service, commercial carrier or interstate wire transmission by Defendants included information or communications in furtherance of or necessary to effectuate the scheme.

39. Defendants' misrepresentations, acts of concealment and failures to disclose were knowing and intentional, and made for the purpose of deceiving plaintiffs and the class and obtaining their property for Defendants' profit, gain, and benefit.

40. Defendants either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material, and plaintiffs and the class relied on the misrepresentations and omissions as set forth above.

41. As a result, Defendants have obtained money and property belonging to Plaintiffs and Class members, and Plaintiffs and the Class have been injured in their business or property by the Defendant's overt acts of mail and wire fraud.

## Pattern of Racketeering Activity

42. Each Defendant has engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing or aiding and abetting in the commission of at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§1341 and 1343 as described above, within the past ten years. In fact, Defendants have committed thousands of acts of racketeering activity. Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results and impacted similar victims, including Plaintiffs and class members.

43. Each Defendant participated in, conducted, directed, and facilitated the affairs of the enterprise and the illegal and fraudulent scheme being perpetrated by the RICO enterprise.

44. These multiple acts of racketeering activity which Defendants committed and/or

conspired to or aided and abetted in the commission of, were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

45.     The pattern of multiple acts of racketeering activity, as alleged herein, was continuous and related over a period of over 6 years.

## INTERSTATE TRADE AND COMMERCE

46.     The national market for Household Goods shipping is estimated to be in excess of $3 billion annually.

47.     Throughout the Class Period, there was a continuous and uninterrupted flow of transactions by Defendants in interstate commerce throughout the United States.

48.     Defendants' unlawful activities, as described herein, took place within the flow of interstate commerce between Defendants and Plaintiff class members who were located in states other than the states in which Defendants are located, and had a direct, substantial, and reasonably foreseeable effect upon interstate commerce.

## DEFENDANTS AND THE HOUSEHOLD GOODS SHIPPING MARKET

49.     According to the AMSA, in 2004, the national market for the interstate transport of Household Goods was in excess of $3 billion with over a million individual moves. Defendants are among the largest interstate Household Goods Carriers in the United States. In 2003, Defendants together handled nearly 85% of the national market:

    a.     Defendant Atlas ranked number four with 11 % of the market;

    b.     Defendant Allied ranked number five with 11 % of the market;

    c.     Defendant North America ranked number two with 15.4% of the market;

    d.     Defendant Mayflower ranked number three with 11.1 % of the market;

e.   Defendant United ranked number one with 30.7% of the market;

f.   Defendant Bekins ranked number six with 4.5% of the market; and

g.   Defendant Wheaton ranked number twelve with 1.5% of the market.

50.   The Defendants are each other's principal competitors in the national Household Goods Moving Services market.

51.   Household Goods Moving Services are fungible in the sense that Household Goods Moving Services provided by any one Household Goods Carrier are readily substitutable for the Household Goods Moving Services provided by any other Household Goods Carrier.

52.   Household Goods Moving Services are homogenous services sold by Household Goods Carriers, including Defendants, to Household Goods shipping customers, including Plaintiffs and the members of the Class, primarily based on price.

53.   The Household Goods Moving Services market in the United States is highly concentrated, and there exist substantial barriers to entry in this market. Both factors facilitate the implementation and maintenance of a horizontal price-fixing cartel such as that perpetrated by Defendants and alleged herein.

## DEFENDANT AMSA FACILITATED THE CONSPIRACY

54.   AMSA is a trade association whose members number over 3200 entities nationwide.

55.   AMSA is the exclusive trade association for the Moving and Storage industry and, as such, publishes tariffs. All of its members agree to be bound by the tariffs and to charge the moving public the rates contained in the tariffs under the terms and conditions specified therein. The tariff that controls rates and "Fuel Surcharges" is called 400-N.

14

56.     AMSA was aware of the "Fuel Surcharge" conspiracy, and participated in, coordinated, facilitated, and/or ratified the conspiracy and the illegal acts of the Household Goods Carrier Defendants as averred herein.

57.     At all times in all matters relevant hereto, AMSA acted as the Attorney in Fact for each Defendant.

## THE STATUTORY SCHEME GOVERNING INTERSTATE TRANSPORTATION OF HOUSEHOLD GOODS

58.     Transportation of Household Goods by the carriers in the moving and storage industry is regulated by Title 49 U.S.C. Subtitle IV Part B Chapter 137 and Chapter 147.

59.     Pursuant to 49 U.S.C. § 13701, rates, rules and practices related to the transportation of household goods must be "reasonable."

60.     Pursuant to 49 U.S.C. § 13702(a), interstate carriers of household goods are required to maintain and publish accurate tariffs that contain the rates for the services they offer. These tariffs must be available for inspection by the Surface Transportation Board ("STB", or "Board") and by the public. It is illegal to charge more than the rate specified in a published tariff or to enter into agreements to charge more than the amount specified in such a tariff. 49 U.S.C. § 13702(c) provides:

**(c) Tariff Requirements for Household Goods Carriers.–**

(1)     **In general.** – A carrier providing transportation described in subsection (a)(2) shall maintain rates and related rules and practices in a published tariff. The tariff must be available for inspection by the Board and be made available for inspection by shippers upon reasonable request.

(2)     **Notice of availability**. – A carrier that maintains a tariff under this subsection may not enforce the provisions of the tariff unless the carrier has given notice that the

15

tariff is available for inspection in its bill of lading or by other actual notice to individuals whose shipments are subject to the tariff.

(3) **Requirements.** — A carrier that maintains a tariff under this subsection is bound by the tariff except as otherwise provided in this part. A tariff that does not comply with this subsection may not be enforced against any individual shipper.

61. Household goods carriers may collectively agree in a restricted number of circumstances to fix and adjust rates without being in violation of United States antitrust laws when they act pursuant to an agreement submitted to and approved by the STB as being in the public interest. Any other concerted action has no antitrust immunity and may violate the Sherman and/or Clayton Acts. The agreements that are eligible for the antitrust exemption are set forth in 49 U.S.C. § 13703 as follows:

**13703. Certain collective activities; exemption from antitrust laws**

(a) **Agreements.**–

(1) **Authority to enter** – A motor carrier providing transportation or service subject to jurisdiction under chapter 135 may enter into an agreement with one or more such carriers to establish –

(A) through routes and joint rates;

(B) rates for the transportation of household goods;

(C) classifications;

(D) mileage guides;

(E) rules;

(F) divisions;

**(G)** rate adjustments of general *application based on industry average carrier costs* (so long as there is no discussion of individual markets or particular single-line rates); or

**(H)** procedures for joint consideration, initiation, or establishment of matters described in subparagraphs (A) through (G).

(Emphasis added). This complaint concerns subsection G.

62. 49 U.S.C. § 14704 provides a remedy to customers who are victims of unlawful rates, including the filing of civil actions:

**14704. Rights and remedies of persons injured by carriers or brokers**

\*\*\*

(b) **Liability and Damages for Exceeding Tariff Rate**.—A carrier providing transportation or service subject to jurisdiction under chapter 135 is liable to a person for amounts charged that exceed the applicable rate for transportation or service contained in a tariff in effect under section 13702.

(c) **Election** —

(1) **Complaint to DOT or board; civil action**.—A person may file a complaint with the Board or the Secretary, as applicable, under section 14701 (b) or bring a civil action under subsection (b) to enforce liability against a carrier or broker providing transportation or service subject to jurisdiction under chapter 135.

## DEFENDANTS' TARIFF 400-N

63. Pursuant to this statutory scheme, Defendants did enter into an Agreement to fix, peg, raise, maintain, and/or stabilize prices for their services. This Agreement was filed with the

17

STB. Its prior approval by the Interstate Commerce Commission, the predecessor of the STB, was renewed by the STB.

64. The Agreement contained a provision which allowed the carriers to make "general rate increases or decreases," that is "rate adjustments", provided they are "limited to industry average carrier costs."

65. Towards that end, the carriers promulgated a tariff, known as Tariff 400-N, which each Defendant is required to publish and observe, and make available for inspection by potential customers. Tariff 400-N was not filed with, nor approved by, the STB.

66. In Defendants' Tariff 400-N, the total cost of a move, which is a result of differential pricing based on factors such as the shipper, weight, mileage, place of origin, and destination, and certain costs such as fuel, is referred to as the "transportation charge." Defendants refer to the "transportation charge" among themselves as the "linehaul charge."

## DEFENDANTS CONSPIRED TO FIX PRICES AND CHARGE AMOUNTS VASTLY IN EXCESS OF THEIR OWN APPROVED AGREEMENT AND PUBLISHED TARIFF BY USE OF THE FUEL SURCHARGE

67. Tariff 400-N contains, among other things, certain provisions for a rate adjustment called a "Fuel Surcharge."

68. Defendants' use of the term "Fuel Surcharge" to characterize the "rate adjustment" in Tariff 400-N suggests that it is a charge to recover only the increased fuel costs associated with the movement of household goods to which it is applied, and compensates them only for the actual increase in the cost of fuel above the base cost of fuel that is already included in the transportation charge.

69. The method by which Defendants agreed and conspired to calculate these "Fuel Surcharges" is set forth in a formula that sets the fuel surcharge as a percentage of the entire

18

transportation charge. This practice is unreasonable and unlawful, and results in charges far in excess of the actual increased cost of fuel for that movement, and in excess of that cost represented by Defendants' published tariff. The purported "Fuel Surcharge" is often greater than the entire cost of fuel already charged consumers in the line item called the "transportation charge." This rate adjustment is not based on industry average carrier cost. In fact, this rate adjustment is grossly in excess of the adjustment permitted by the statute.

70. Defendants knowingly violated RICO, the antitrust laws, and the ICCTA to reach agreements and conspire to make rate adjustments of general application that were not based upon industry average carrier costs. In order to facilitate their illegal scheme, Defendants published one "Fuel Surcharge" in Tariff 400-N for the public and the STB, and colluded to charge a different "Fuel Surcharge" pursuant to the scheme set forth above. Item 16 of Tariff 400-N, describing the fuel surcharge rate adjustment, uses deliberately ambiguous and misleading language to suggest that the "Fuel Surcharge" is pegged at and restricted to Defendants' actual additional cost of fuel. It states, in relevant part, as follows:

**PROFESSIONAL MOVERS COMMERCIAL RELOCATION TARIFF**
**STB HGB 400-N**
**SECTION 1 - RULES AND REGULATIONS -3rd REVISED PAGE 21**

**R ITEM 16 (Concluded)**
**FUEL COST PRICE ADJUSTMENT (SURCHARGE)**

2. If the first Monday of the calendar month is a Federal holiday, the price will be determined based on the stated DOE price available on the next subsequent business day (Tuesday)

3. The DOE fuel price obtained will then be indexed based on the fuel price/adjustment factor matrix set forth in this item to determine the Fuel Cost Price Adjustment that will become applicable on the fifteenth (15th) day of the same month. The adjustment determined will apply for shipments loaded on the 15th day of the month and remain in effect through the 14th day of the following month starting from the effective date of this item.

For example, if the reported price of self-service diesel fuel determined on Monday, June 5th is $1.599 per gallon, a 2.0 percent Fuel Cost Price Adjustment will apply for shipments loaded as of June 15th through July 14th. Then, if the reported price of diesel fuel on Monday, July 3rd increases to $1.749 per gallon, a three (3.0%) percent Fuel Cost Price Adjustment will apply for shipments loaded as of July 15th through August 14th.

**4.     Notwithstanding any other provision of the tariff, the Fuel cost adjustment WILL APPLY to the transportation charges applicable on SIT shipments when such shipments are delivered to or removed from the storage-in-transit location during the period that a Fuel Surcharge is in effect.**

(Capitals in original) (emphasis added).

71.     By using the terms "WILL APPLY to the transportation charge" and setting forth their percentage increases in the cost of diesel fuel in their tariff, Defendants intended that consumers and the STB would conclude that they were adjusting their rates only to compensate for the actual increase in average Carrier fuel costs, and were therefore in compliance with the statutory provision permitting collective "rate adjustments of general application based on industry average carrier costs" as defined and limited by 49 U.S.C. § 13703(a)(1)(G) (emphasis added) and required by their Agreement filed with the STB.

72.     Defendants conspired with each other, through AMSA, to mislead their consumers and the STB by publishing the method for determining the "Fuel Surcharges" described above, but disseminating amongst themselves for strictly internal use a more forthcoming description of how Defendants should determine "Fuel Surcharges," which would allow Defendants to charge amounts vastly in excess of their actual increased cost of fuel. The web site for AMSA members (www.promover.org) and the software AMSA sold to its members contain instructions to be used to calculate the tariffs. The instructions on how to calculate and

implement the unlawful fuel surcharge are **not** published for consumers or filed with the STB.

Those instructions are set forth as follows:

### Item 16, Fuel Cost Price Adjustment –Surcharge

The following percentage Fuel-Related Cost Price Adjustment (Surcharge) will apply on linehaul transportation charges and transportation charges on shipments picked up and delivered into storage-in-transit, as described below:

1.　On the first Monday of each calendar month, the "national U.S. average" price of diesel fuel will be determined based on the price stated by the US Department of Energy (DOE), Energy Information Administration's (EIA) survey of "Retail On-Highway Diesel Prices." This price will be obtained by calling the DOE Fuel Hot Line at 202-586-6966 or via the DOE Internet web site at www.cia.doe.gov.

2.　If the first Monday of the calendar month is a Federal holiday, the price will be determined based on the stated DOE price available on the next subsequent business day (Tuesday).

3.　The DOE fuel price obtained will then be indexed based on the fuel price/adjustment factor matrix set forth in this item to determine the Fuel Cost Price Adjustment that will become applicable on the fifteenth (15th) day of the same month. The adjustment determined will apply for shipments loaded beginning on the 15th day of the month and remain in effect through the 14th day of the subsequent following month starting from the effective date of this item. For example, if the reported price of self-service diesel fuel determined on Monday, June 5, 2000 is $1.259 per gallon, a two (2.0%) percent Fuel Cost Price Adjustment will apply for shipments loaded as of June 15,2000 through July 14, 2000. Then, if the reported price of diesel fuel on Monday, July 3, 2000 increases to $1.379 per gallon, a three (3.0%) percent Fuel Cost Price Adjustment will apply for shipments loaded as of July 15, 2000 through August 14, 2000.

4.　To determine the Fuel Cost Adjustment amount to apply, **multiply the applicable linehaul transportation charges** as determined in accordance with Sections 3, 5, 6, and 7, and the applicable pickup and delivery transportation charges on Storage-In-Transit shipments as determined in accordance with Items 210 and 410 of this tariff, **by the percentage Fuel Cost Adjustment Factor. The resulting charge is in addition to all other applicable transportation charges.** For example, if the applicable linehaul transportation charge is $5,300, a two (2.0%) percent Fuel Cost Adjustment Factor would be $106.00. (Emphasis added)

| When the DOE Fuel Price Per Gallon reported on the first Monday of the month is: | The Fuel Cost Adjustment Factor that becomes effective on the 15TH day of the same month is: |
|---|---|
| Less than $1. 137 | 0% |
| From $1.137 to $1.235 | 1.0% |
| From $1.236 to $1.334 | 2.0% |
| From $1.335 to $1.434 | 3.0% |
| From $1.435 to $1.533 | 4.0% |
| From $1.534 to $1.632 | 5.0% |
| From $1.633 to $1.732 | 6.0% |
| From $1.733 to $1.831 | 7.0% |
| From $1.832 to $1.930 | 8.0% |
| From $1.931 to $2.029 | 9.0% |
| From $2.030 to $2.130 | 10.0% |
| From $2.131 to $2.230 | 11.0% |
| From $2.231 to $2.330 | 12.0% |
| From $2.331 to $2.430 | 13.0% |
| From $2.431 to $2.530 | 14.0% |
| From $2.531 to $2.630 | 15.0% |
| Over $2.630 | (See Note I) |

Note 1: If the DOE fuel price per gallon exceeds $2.630, the 15% fuel surcharge, subject to paragraphs 1 through 4 herein, will be increased by an additional 1% for every 10 ($0.10) cents, or fraction thereof, per gallon increase in the price above $2.630 per gallon.

Note 2: Notwithstanding any other provisions of the tariff, the Fuel Cost Adjustment Factor WILL APPLY to transportation charges applicable on storage– in-transit shipments when such shipments are delivered to or removed from the storage-in-transit location during the period that the Fuel Cost Adjustment Factor is in effect.

Note 3: The Fuel Cost Adjustment Factor WILL BE SHOWN SEPARATELY from the linehaul revenue on carrier transportation documents for the purpose of identifying the amount as special fuel-related revenue.

Note 4: Fractions obtained in the calculation of the Fuel Cost Adjustment Factor will be disposed of as provided in Item 21 of this tariff.
Thus, in their instructions to their members on how to charge for fuel they agreed that the "Fuel Surcharge" should be determined as follows:

22

5. To determine the Fuel Cost Adjustment amount to apply, *multiply* the applicable *linehaul transportation charges* as determined in accordance with Sections 3, 5, 6, and 7, and the applicable pickup and delivery transportation charges on Storage-In-Transit shipments as determined in accordance with Items 210 and 4 I0 of this tariff, *by the percentage Fuel Cost Adjustment Factor*. The resulting charge is in addition to all other applicable transportation charges.
*For example, if the applicable linehaul transportation charge is $5,300, a two (2.0%) percent Fuel Cost Adjustment Factor would be $106.00.* (Emphasis added)

73. By stating in the published tariff that the "Fuel Cost Adjustment will apply to the transportation charges," Defendants led the public and the STB to believe that Defendants were only adding to the customer's total bill the actual average increase in the cost of fuel. An "adjustment" for "fuel cost" implies that transportation charges will be increased solely to reflect the actual increase in that cost. However, the example provided to their members shows the percentage multiplied by the entire transportation charge to yield a number which is then added to the customer's bill. This method was deliberately omitted in the tariff, which instead published a different and intentionally misleading example:

> For example, if the reported price of self-service diesel fuel determined on Monday, June 5, 2000 is $1.259 per gallon, a two (2.0%) percent Fuel Cost Price Adjustment will apply for shipments loaded as of June 15, 2000 through July 14, 2000. Then, if the reported price of diesel fuel on Monday, July 3, 2000 increases to $1.379 per gallon, a three (3.0%) percent Fuel Cost Price Adjustment will apply for shipments loaded as of July 15,2000 through August 14,2000.

74. Nowhere In the published tariff did Defendants reveal, disclose, or otherwise inform of their separate and secret agreement, using different language, different instructions, and a different formula, to fix prices in a way that is not based on "industry average carrier costs," or in other words, to inflate, misrepresent, and fix prices in a way that is not based on the actual, average increase in the cost of diesel fuel. The rate adjustments made pursuant to their actual agreement were not disclosed by their published tariff.

23

75.     The following example demonstrates how the scheme works: A move from Washington D.C. to Charleston, S.C. involves approximately 1000 driving miles (500 miles each way), assuming the van is empty on the return trip. Industry records show that the average moving truck gets 5 miles to a gallon of diesel fuel. Assuming a hypothetical price of $3.00 per gallon, the moving company's entire fuel bill for the trip would be $600. (1000 miles ÷ by 5 mpg – 200 x $3.00 – $600.00) The moving company has already built in a charge for fuel in its original transportation charge. There is no separate charge for fuel. However, there is a separate charge for a "fuel surcharge". Using the 400-N tariff formula of 15%, if the move in question had a transportation charge of $9,000.00, then the fuel surcharge would be $1,350.00 or more than twice the amount of the entire cost of the mover's fuel for the 1000 mile trip. The consumer is being led to believe that the only additional charge on his bill is the mover's actual increase in the cost of his diesel fuel. Assuming that the percentage increase represents the actual industry average, that is the amount the carrier could agree with other carriers to recover under an agreement approved by the STB. However, the Defendants conspired and agreed that instead of adding their increase in the cost of fuel to the transportation charge, they would multiply a percentage increase in the cost of fuel by the *entire* transportation charge and add the resulting amount to the total charge. In the case set forth above they would multiply 15% x *$9, 000.00 to yield a fuel surcharge that is more than double their actual cost of fuel.* Defendants, therefore, compute a Fuel Surcharge as a percentage of the transportation, or linehaul, charge, which has no relationship to the actual increased cost of fuel associated with the movement of goods. There is no nexus between the "Fuel Surcharge" actually charged and fuel consumption.

Instead, it is used as a revenue enhancer.

## DEFENDANTS KNEW THAT THEIR FUEL SURCHARGE PRICE INCREASES WERE ILLEGAL, FUNDAMENTALLY FLAWED, UNFAIR TO SHIPPERS, AND ADVERSE TO THE PUBLIC INTEREST

76. Defendants deliberately and knowingly adjusted their rates In a manner calculated to disguise profits as cost increases that should have been, but in this instance were not, reflective of rising "industry average carrier costs" for diesel fuel. In so doing, Defendants did not collectively make "rate adjustments of general application based on industry average carrier costs," as specified in 49 U.S.C. § 13703(a)(1)(G). Therefore, their conduct was not exempt from Federal Antitrust Laws.

77. Defendants engaged in a practice that was unlawful when they conspired to charge a rate greatly in excess of "industry average carrier costs," all as Prohibited by 49 U.S.C. § 13701.

78. The Defendants knew that they were acting unlawfully in violation of 49 U.S.C. §§ 13702, 13703, 14704, and 14903 set forth above when they entered into their side agreement and concealed it from the shipping public and the STB.

79. In September of 1999, motor carrier shippers initiated an action before the STB contending that motor carrier rate bureaus acted unlawfully in agreeing to propose General Rate Increases (GRIs) that far exceeded their cost increases and therefore were not permitted "rate adjustments of general application based on industry average carrier costs" under 49 U.S.C. § 13703(a)(1)(G). The shippers asserted that many carriers were already "recovering increased fuel costs through fuel surcharges" and that to the extent the proposed GRIs reflected increased fuel costs, the "carriers will be recovering twice for the same fuel cost increase." Because of its concern "about the reasonableness of the proposed GRIs," the STB decided to suspend and investigate them. *In re* Protests and Petitions for Suspension and Investigation of General Rate

25

Increases, STB Docket No. ISM 35006. On October 8, 1999, the rate bureaus notified the STB that the rates under investigation had been canceled. On October 14, 1999, the STB decided that in view of the cancellation of the rates under investigation, the STB Docket No. ISM 35006 proceeding would be discontinued, effective on October 15,1999.

80.     In August of 2006, the STB gave notice that it would examine allegations of profiting through "Fuel Surcharges" by railroads. The railroads had been engaging in a practice identical to that of Defendants, multiplying the percentage increase in the cost of fuel by the shippers' entire transportation charge and adding the product to the transportation charge. The STB opined then that the practice was unreasonable:

> The carriers concede that most of their "Fuel Surcharges" are calculated as a percentage of the base rate. The record before us indicates that there is little, if any, correlation between an increase in the cost of fuel for an individual rail movement and the level of the base rate for that movement. To the extent that a base rate is cost-based, it reflects substantial costs, including the costs of labor and of capital investments, that do not track rapid changes in fuel costs.

*In re* Rail Fuel Surcharges, STB Ex Parte No. 661 Rail.

81.     In January of 2007, the STB issued its final order in the railroad fuel surcharge action, affirming its earlier action, and held, inter alia, as follows:

The Board instituted this proceeding to inquire into rail carrier practices related to fuel surcharges. A fuel surcharge is a separately identified component of the total rate that is charged for the transportation involved, purportedly to recoup increases in the carrier's fuel costs. The Board first held a hearing in May 2006, and in August 2006 it sought comments on several proposed measures to address the Board's concerns about these practices. After considering all of the comments received, we conclude that computing rail fuel surcharges as a percentage of a base rate is an unreasonable practice, and we direct carriers to change this practice.

\* \* \*

After considering all of the comments, we affirm the preliminary conclusion in the August decision that **it is an unreasonable practice to compute fuel surcharges as a percentage of the base rates**. Because railroads rely on differential pricing, under which rates are dependent on factors other than costs, **a surcharge that is tied to the level of the base rate, rather than to fuel consumption for the movement to which the surcharge is applied, cannot fairly be described as merely a cost recovery mechanism.** Rather, a fuel surcharge program that increases all rates by a set percentage stands **virtually no prospect of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied.**

\* \* \*

But if a carrier chooses to use a fuel surcharge program, it must be based upon attributes of a movement that directly affect the amount of fuel consumed. In other words, there must be a reasonable nexus to fuel consumption.

A fuel surcharge program keyed to the base rate has one primary benefit - ease of application. Although clearly easy to implement, a fuel surcharge program keyed to the base rate almost guarantees that some shippers will be forced to pay the increased fuel costs of other shippers. For carriers to continue to apply fuel surcharge programs that are calculated as a percentage of the base rate - when practical alternatives are available - would permit them to continue to mislead their customers and would be unfair.

*In re* Rail Fuel Surcharges, STB Ex Parte No. 661 (emphasis added).

## CLASS ACTION ALLEGATIONS

82. Plaintiffs bring this action against defendants on their own behalf and, pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure, as a class action on behalf of the following class:

All individuals or entities (excluding governmental entities, Defendants, and Defendants' parents, predecessors, subsidiaries, affiliates, agents and Defendants' co-conspirators) who purchased Household Goods Moving Services for interstate shipments directly from any of the Defendants, Defendants' co-conspirators, or Defendants' predecessors, subsidiaries, affiliates or agents, at any time during the period January 1, 2002 through the Present.

83. Excluded from the Class are Defendants, any entity in which Defendants have a controlling interest or are a parent or subsidiary of, or any entity that is controlled by Defendants and any of its officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns.

84. The Class period is January 1, 2002 through the present.

85. There are thousands of geographically dispersed putative members of the Class. Defendants sold "Household Goods Moving Services" throughout the United States. Accordingly, the Class is so numerous that joinder of all members is impracticable. The Class is ascertainable, as the names and addresses of all Class members can be identified in business records maintained by Defendants.

86. Plaintiffs will fairly and adequately protect the interests of the Class and have no interests adverse to, or which directly and irrevocably conflict with, the interests of other Class members. Plaintiffs are represented by counsel experienced and competent in the prosecution of

complex class action litigation.

87.     There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class members. Such common questions include, *inter alia*:

a.     Whether Defendants have engaged in a scheme to improperly and unlawfully inflate the prices charged to their customers;

b.     Whether Defendants have engaged in mail and wire fraud.

c.     Whether Defendants engaged in a pattern of racketeering activity.

d.     Whether the alleged Enterprise is an enterprise within the meaning of 18 U.S.C. 1961(4).

e.     Whether Defendants' conducted or participated in the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

f.     Whether Defendants' overt and/or predicate acts in violation of 18 U.S.C. 1962(c) proximately cause injury to plaintiffs' and class members' business or property.

g.     Whether Defendants' fraudulently concealed their scheme.

i.     Whether Defendants have breached their implied duty of good faith and fair dealing.

j.     Whether Defendants violated 18 U.S.C. 1962(d); and

k.     Whether Defendants directed, controlled, or agreed to facilitate the fraudulent scheme being perpetrated by the RICO enterprise;

l.     Whether the rates, rules and practices related to the transportation of household goods were "reasonable;"

m. Whether Defendants charged rates that exceed the applicable rate for transportation or service contained in a tariff published under 49 U.S.C. § 13702;

n. Whether Defendants engaged in a combination or conspiracy among themselves to unlawfully fix, peg, raise, maintain, and/or stabilize Fuel Surcharge prices charged for interstate moves within the United States;

o. The duration of the conspiracy alleged in this Complaint, and the nature and character of the acts performed by Defendants in furtherance of the conspiracy;

p. Whether the alleged conspiracy violated Section 1 of the Sherman Act;

q. Whether the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et. al., and similar deceptive trade practices acts of the various states, has been violated;

r. Whether the Fuel Surcharge agreed to and implemented by Defendants was unlawful;

s. The effect of Defendants' conspiracy on the Fuel Surcharge prices charged for interstate moves within the United States during the Class Period;

t. Whether the conduct of Defendants, as alleged in this Complaint, caused damages to the Plaintiffs and the other members of the Class; and

u. The appropriate measure of damages sustained by Plaintiffs and other members of the Class.

88. Plaintiffs' claims are typical of the claims of the Class members because they originate from the same illegal, fraudulent, and confiscatory practices of Defendants, and Defendants have acted in the same way toward Plaintiffs and the Class.

89. Plaintiffs will fairly and adequately protect the interests of the members of the

Class, are committed to the vigorous prosecution of this action, have retained counsel competent and experienced in class litigation and have no interests antagonistic to or in conflict with those of the Class. As such, Plaintiffs are adequate Class representatives.

90.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for the party opposing the Class.

91.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable. Further, the expense and burden of individual litigation make it impossible for all the Class members individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I:  RICO VIOLATIONS
### Violation of 18 U.S.C. § 1962(c)

92.     Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

93.     This claim for relief Defendants have violated 18 U.S.C. §1962(c) by conducting, or participating directly or indirectly in the conduct of the affairs of Defendants through a pattern of racketeering.

94.     As a direct and proximate result, Plaintiffs and the Class members have been injured in their business or property by the predicate acts which make up the Defendants' patterns of racketeering activity through the Enterprise.

95.     Specifically, Plaintiffs and Class members have been injured in their business or property by having paid too much for fuel surcharges to Defendants pursuant to agreements

31

entered into with Defendants for "Household Goods Moving Services."

96.     As a result of the foregoing, Plaintiffs and Class members have been injured and damaged by having paid too much for services purchased from Defendants.

## COUNT II: RICO VIOLATIONS
### Violation of 18 U.S.C. § 1962(d)

97.     Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

98.     This claim for relief arises under 18 U.S.C. §1962(d), which makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

99.     Defendants have not undertaken the above practices and activities in isolation, but instead have done so as part of a common scheme and conspiracy.

100.    Each Defendant and members of the conspiracy, with knowledge and intent, agreed to the overall objective of the conspiracy, agreed to commit acts in of fraud to obtain from Plaintiffs and the Class excess and artificially inflated fuel surcharges, and Defendants actually committed such acts.

101.    For the fraudulent scheme described above to be successful, each Defendant and other members of the conspiracy had to agree to further the conspiracy.

102.    Defendants' conspiracy to overcharge Plaintiffs and the class through the fraudulent scheme described above violates 18 U.S.C. 1962(d).

103.    Each of the Defendants agreed to participate, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity comprised of numerous acts of mail fraud and wire fraud, and each Defendant so participated in violation of 18 U.S.C. 1962(c).

104.     Each of the Defendants intended to further the endeavors of the RICO enterprise and adopted the goals of the RICO enterprise that fraudulently used the mail or wire to fraudulently overcharge Plaintiffs and the Class for fuel surcharges in connection with the delivery of "Household Goods Moving Services."

105.     As a result of the foregoing, Plaintiffs and Class members have been injured and damaged by having paid too much for services purchased from Defendants.

## COUNT III: ANTI-TRUST VIOLATIONS
### Section 1 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 1 ("Sherman Act") and Section 4 of the Clayton Antitrust Act of 1914, 15 U.S.C. § 15 ("Clayton Act")

106.     Plaintiffs incorporate by reference, as if fully set forth herein, the allegations contained in the preceding paragraphs of the Complaint.

107.     During the Class Period, being four years prior to the filing hereof, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to artificially and unlawfully raise, peg, fix, maintain, and/or stabilize Fuel Surcharge prices for interstate moves in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

108.     In formulating and effectuating the alleged contract, combination, or conspiracy, Defendants engaged in anti-competitive activities, the purpose and effect of which was to artificially raise, fix, peg, maintain, and/or stabilize "Fuel Surcharges." These activities included the following:

a.     agreeing to charge "Fuel Surcharges" at certain levels and otherwise to fix, raise, peg, maintain, and/or stabilize the "Fuel Surcharges" charged for interstate moves within the United States; and

b.     charging "Fuel Surcharges" at the agreed-upon rates.

109.    During the Class Period, Defendants increased, as a ratio to external costs - and profits - the "Fuel Surcharges" they charged. These relative increases in "Fuel Surcharges" cannot be explained by, nor do they accurately reflect, the actual increase in industry average carrier cost of fuel but rather were the result of anticompetitive conduct.

110.    During the Class Period, Plaintiff and members of the Class paid "Fuel Surcharges" directly to Defendants, their agents, subsidiaries, and their controlled affiliates.

111.    The illegal combination and conspiracy alleged herein has had the following effects, among others:

        a.      Price competition in the charging of "Fuel Surcharges" has been restrained, suppressed, and/or eliminated;

        b.      Price competition in the contracting of Household Goods Moving Services has been restrained, suppressed, and/or eliminated;

        c.      "Fuel Surcharges" charged by Defendants have been fixed, raised, maintained, and/or stabilized at artificially high, noncompetitive levels; and

        d.      Members of the Class have been deprived of the benefit of free and open competition.

112.    During the Class Period, Plaintiffs and the members of the Class, as a direct and proximate result of Defendants' antitrust violations, paid excessive "Fuel Surcharges" they would not have paid absent such violations. Plaintiffs and the members of the Class, therefore, have been injured and financially damaged in their respective businesses and property in an amount to be determined according to proof and are entitled to recover threefold the damages sustained pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

34

113.     As a result of the foregoing, Plaintiffs and Class members have been injured and damaged by having paid too much for services purchased from Defendants.

**COUNT IV:**
**Action for Damages for Exceeding Tariff Rate**

114.     Plaintiffs incorporate by reference, as if fully set forth herein, the allegations in the preceding paragraphs of the Complaint.

115.     During the claim period, Defendants engaged in a continuing agreement, undertaking and conspiracy to charge rates that exceed the applicable rate for transportation or service contained in a tariff published under 49 U.S.C. § 13702, and as such are liable to Plaintiffs pursuant to 49 U.S.C. § 14704(b) for the excessive amounts charged.

116.     As a result of the foregoing, Plaintiffs and Class members have been injured and damaged by having paid too much for services purchased from Defendants.

**COUNT V**
**Breach of Contractual Duty of Implied Duty of Good Faith and Fair Dealing**

117.     Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

118.     Plaintiffs and the other members of the Class entered into contracts with Defendants or one of its acquired subsidiaries for the purchase of "Household Goods Moving Services." The terms of these contracts provide that the prices Defendants would charge Plaintiffs and the Class certain "fuel surcharges" that were reflected as a cost to Defendant in the contract.

119.     The "fuel surcharges" paid to Defendants do not constitute legitimate costs for fuel that Defendants are entitled to retain. Accordingly, as a result of Defendants' conduct,

35

Plaintiffs and the Class have been charged more than they should have been under the terms of their agreements for fuel.

120. Defendants misrepresented costs to Plaintiffs and the Class and have breached their implied duty of good faith and fair dealing imposed on all of their contracts. In this regard, by intentionally inflating and misrepresenting fuel surcharges, and engaging in the other illegal, fraudulent and deceptive conduct alleged herein, Defendants have overcharge Plaintiffs and the Class.

121. As a result of the foregoing, Plaintiffs and Class members have been injured and damaged by having paid too much for services purchased from Defendants.

**COUNT VI**
**Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 et. al.)**
**And Similar State Law Consumer Protection Acts**

122. Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

123. This Count is brought by Plaintiffs in their individual capacity and on behalf of all putative class members residing in the State of Illinois or residents of a state with a similar consumer protection act.

124. At all times material herein Defendants overcharged their customers for "Household Goods Moving Services" and utilized the following phrase on invoices to indicate this cost (copies of said invoices attached as Exhibit 1): "FUEL SURCHARGES."

125. At all relevant times herein, there were in full force and effect in the State of Illinois a statute commonly known as The Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2, which provides in pertinent part as follows:

Unfair methods of competition and unfair deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression or omission of any material fact with the intent that others rely upon the concealment, suppression or employment of any practice described in section 2 of the "Uniform Deceptive Trade Practices Act," approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful where any person has in fact been misled, deceived or damaged thereby. In construing this section, consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to section 5(a) of the Federal Trade Commission Act.

126. The Consumer Fraud and Deceptive Business Practices Act further provides, 815 ILCS 505/10(a);

Any person who suffers actual damage as a result of a violation of this Act committed by any other person may bring an action against such person. The court, in its discretion may award actual economic damages or any other relief which the court deems proper...

127. Each member of the putative class is a consumer within the meaning of the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1(c) and/or the similar state law consumer protection acts of their resident state.

128. The sale of "Household Goods Moving Services" and related products as alleged herein constitutes the sale of merchandise as defined by the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1(b)(d).

129. The conduct of Defendants as alleged herein constitutes the use or employment of deception, fraud, false pretense, false promise, misrepresentation and the concealment, suppression or omission of a material fact with the intent that Plaintiff and all members of the class rely upon the concealment, suppression and/or omission of such material fact as to constitute a violation of Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2, and the applicable similar state law consumer protection statutes of the various states.

37

130.     Defendants knew, or should have known, that their actions in omitting pertinent information relevant to the "Fuel Surcharge" were material omissions.

131.     Defendants knew, or should have known, that Plaintiffs and the Class would have relied upon the omitted information, had it been disclosed, in making the decision whether to purchase "Household Goods Moving Services" from Defendants and/or whether to agree to pay the "fuel surcharge" at issue in this case.

132.     Plaintiff and each member of the putative class have suffered actual economic damages by paying increased amounts for "fuel surcharges" as a result of the aforesaid violations of Consumer Fraud and Deceptive Businesses Practices Act by Defendants.

## COUNT VII
### Unjust Enrichment

133.     This Count is brought in the alternative to any contract and statutory claims.

134.     Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

135.     Plaintiffs conferred a benefit upon defendants, in the form of higher payments to the defendants. Said benefit was conferred as a result of Defendants' deception, misconduct, and material misrepresentations to Plaintiffs and the Class.

136.     It would be unjust to allow the Defendants to retain the said benefit, thereby enriching them, without compensating the plaintiffs.

## PRAYER FOR RELIEF

137.     **WHEREFORE**, Plaintiffs pray that:

a.      The Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

38

b.     That the Court certify the Class as follows: All individuals or entities (excluding governmental entities, Defendants, and Defendants' parents, predecessors, subsidiaries, affiliates, agents and co-conspirators) who purchased Household Goods Moving Services for interstate shipments directly from any of the Defendants, Defendants' co-conspirators, or Defendants' predecessors, subsidiaries, affiliates or agents, at any time during the period within four years prior to the filing of this action.

c.     As to Count One, the Court adjudge and decree that the contract, combination and conspiracy alleged herein is a *per se* unreasonable restraint of trade in violation of Section 1 of the Sherman Act;

d.     As to Count Two, and in the alternative, the Court adjudge and decree that the contract, combination and conspiracy alleged herein resulted in charges that exceeded the applicable rate for transportation or service contained in a tariff under 49 U.S.C. § 13702;

e.     The Court adjudge and decree that Defendants' conduct alleged herein violates Section 1962(c) and (d) of RICO and breached their contractual obligation of good faith and fair dealing;

f.     The Court preliminarily and permanently enjoins Defendants and all persons acting under, in concert with, or for them, from continuing such conduct;

g.     The Court orders Defendants to pay treble the amount of damages suffered by Plaintiffs and the Class as a result of their violations of RICO and the Antitrust laws;

h.     Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiffs and the Class for damages as allowed by law in an amount determined to have been sustained by them;

i. The Court award Plaintiffs and the Class actual economic damages equal to the amount Defendants have procured through imposition and collection of "Fuel Surcharges" plus interest at the maximum rate permitted under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et.al, and similar deceptive trade practices acts of the various states.

j. The Court award Plaintiffs and the Class punitive damages pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/10a, and similar deceptive trade practices of the various states;

j. The Court award Plaintiffs and the Class attorneys' fees and costs, and pre-judgment and post-judgment interest as permitted by law; and

k. The Court award Plaintiffs and the Class such other further relief as may be necessary and appropriate.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

Respectfully submitted,

Dated: May 4, 2007

Robert M. Foote (#03124325)
Craig S. Mielke (#03127485)
Stephen W. Fung (#06289522)
FOOTE MEYERS MIELKE FLOWERS, LLC
28 North First Street
Suite 2
Geneva, Illinois 60134
Telephone: (630) 232-6333
Facsimile: (630) 845-8982

Kathleen C. Chavez, (#6255735)
CHAVEZ LAW FIRM, P.C.
28 North First Street
Suite 2
Geneva, IL 60134
Telephone: (630) 232-4480
Facsimile: (630) 845-8982

Attorneys for the Plaintiffs

# EXHIBIT 1

Oct 27 04 02:30p    Johnson & Daly Moving    (415)457-4363    P.1

*Mou  w/wine 1st out*
*Atlas*

## Household Goods Transportation Cost

| | | | |
|---|---|---|---|
| Orig #: 90-San Francisco, CA | Rates Effdate 10/12/2004 | DOE Price / Fue 1.869 / 8.00% | |
| Dest #: 252-Chicago, IL | Loading date | Valuation Option | .60 per lb |
| Tariff 400M/ATVL (07/01/2004) | Transp Weight 15300 | Valuation Amount | 0.00 |
| Orig Zip 94925 | Dest Zip code 60174 | Valuation Deductible | 0.00 |

### Shipment Information
Zip3 94925  Origin (Sch 3)
Zip3 60174  Destination (Sch 3)

### Charge Breakdown

| Description of Service | Qty | Weight | Rate | Charges |
|---|---|---|---|---|
| Transportation Charges | | 15300 | | 19401.00 |
| Fuel Surcharge 8.00% | | | | 1552.08 |
| J.R.R. 4.00% | | | | 776.04 |
| Orig Service Charge | | 15300 | 3.44 | 526.32 |
| Orig Shuttle Chgs - Miles: 1 | | 15300 | | 2679.00 |
| Dest Service Charge | | 15300 | 6.90 | 1055.70 |

|  | Custom Pack (3) | | | Custom Unpack (3) | | |
|---|---|---|---|---|---|---|
| Container size | Qty | Rate | Total | Qty | Rate | Total |
| Dish Pack | 8 | 83.82 | 670.56 | | | |
| 1.5 Ctn | 32 | 20.06 | 641.92 | | | |
| 3.0 Ctn | 6 | 30.35 | 182.10 | | | |
| 4.5 Ctn | 1 | 37.01 | 37.01 | | | |
| K/Q Mat | 2 | 58.07 | 116.14 | 2 | 14.52 | 29.04 |
| Mirror | 8 | 72.90 | 583.20 | | | |
| Other Ctn | 4 | 31.30 | 125.20 | | | |
| Sub Totals | | | 2356.13 | | | 29.04 |

|  | Crating (1) | | | Uncrating (1) | | |
|---|---|---|---|---|---|---|
| Crate size | | Rate | Total | Qty | Rate | Total |
| *storage* Crate 25 x 62 x 8 | | 21.58 | 172.64 | 1 | 5.40 | 43.16 |
| Crate 42 x 42 x 6 | | 21.58 | 194.22 | 1 | 5.40 | 45.56 |
| Sub Totals | | | 366.86 | | | 91.72 |

Custom Packing (see itemized list)                2356.13
Custom Unpacking (see itemized list)                29.04
Crating & Uncrating (see itemized list)            458.58

**Total Charges**    10956.98

*Any Fuel Surcharge is determined by applicable DOE price and is subject to change*

Prepared By: _____

04/16/2007 10:38 PROGRAM HDQTRS → 98458982 NO.123 P02

Oct 27 04 02:24p Johnson & Daly Moving (415)457-4383 p.2



*Everything to Illinois together*

## Household Goods Transportation Cost

| | | |
|---|---|---|
| Orig SA  50-San Francisco, CA | Rates Effdate 10/12/2004 | DOE Price / FSS  1.869 / 8.00% |
| Dest SA  232-Chicago, IL | Loading date | Valuation Option  .60 per lb |
| Tariff  400N/ATVL (07/01/2004) | Transp Weight 24950 | Valuation Amount  0.00 |
| Orig Zip 94925 | Dest Zip code 60174 | Valuation Deductible  0.00 |

### Shipment Information
Zip3 94925  Origin (Sch 3)
Zip3 60174  Dest dropoff (Sch 3)
Zip3 60174  Destination (Sch 3)

### Charge Breakdown

| Agt# Description of Service | Qty | Weight | Rate | Charges |
|---|---|---|---|---|
| Transportation Charges | | 24950 | | 29398.80 |
| Fuel Surcharge 8.00% | | | | 2331.68 |
| I.R.R. 4.00% | | | | 1175.74 |
| Orig Service Charge | | 24950 | 3.44 | 858.28 |
| Orig Shuttle Chgs - Miles: 1 | | 24950 | | 3670.00 |
| Dest Service Charge | | 24950 | 6.90 | 1721.55 |
| Dest Extra Stop @ Zip3: 60174 | | | 105.57 | 105.57 |

| Custom Pack (3) | | | | | Custom Unpack (3) | | | |
|---|---|---|---|---|---|---|---|---|
| Container | Agt# | Qty | Rate | Total | Agt# | Qty | Rate | Total |
| Dish Pack | | 35 | 83.82 | 2933.70 | | | | |
| 1.5 Ctn | | 54 | 20.06 | 1083.24 | | | | |
| 3.0 Ctn | | 18 | 30.35 | 546.30 | | | | |
| 4.5 Ctn | | 8 | 37.01 | 296.08 | | | | |
| 6.0 Ctn | | 5 | 42.33 | 211.65 | | | | |
| K/D Mat | | 4 | 58.07 | 232.28 | | 4 | 14.52 | 58.07 |
| Mirror | | 48 | 72.90 | 3499.20 | | | | |
| Heavy Duty | | 9 | 91.11 | 819.99 | | | | |
| Other Ctn | | 4 | 31.30 | 125.20 | | | | |
| **Sub Totals** | | | | **9747.64** | | | | **58.07** |

| Crating (3) | | | | | Uncrating (3) | | | |
|---|---|---|---|---|---|---|---|---|
| Crate size | Agt# | Rate | Total | | Agt# | Qty | Rate | Total |
| Crate 25 x 52 x 8 | | 21.58 | 172.64 | | | 1 | 5.40 | 43.16 |
| Crate 42 x 42 x 8 | | 21.58 | 194.22 | | | 1 | 5.40 | 48.56 |
| Crate 49 x 73 x 7 | | 21.58 | 323.70 | | | 1 | 5.40 | 80.93 |
| **Sub Totals** | | | **690.56** | | | | | **172.65** |

Custom Packing (see itemized list)          9747.64
Custom Unpacking (see itemized list)          58.07
Crating & Uncrating (see itemized list)          863.21

**Total Charges          10991.34**

Any Fuel Surcharge is determined by applicable DOE price and is subject to change

Prepared By: _____

*$ 3729.70
incl 6 mos
ATLAS +Deliv $ 22710.94*

04/16/2007 10:35    PROGRAM HOURS  → 5645682                        NO. 123    P004
NOV 01 04 10:14a    Johnson & Daly Moving         (415) 457-4883         p.2

**Atlas**
U.S. DOT NO 125550

**Assured Price Protection Estimate**
ATLAS VAN LINES, INC.
1212 St. George Road, P.O. Box 509
Evansville, Indiana 47703-0509
(800) 252-8885 / (812) 424-2222

Atlas Registration No.
HK-67300-0

| Customer | Gary & Laurel Mead | Consignee | |
|---|---|---|---|
| Street Address | 250 Morningside | Street Address | 2968 Longrion Circle |
| City/State/Zip | Corte Madera CA 4924 | City/State/Zip | St. Charles IL 60174 |
| County | Phone 415-927-1367 | County | Phone |

| Tariff: 400N | Miles | Pricing Option: ARP |
|---|---|---|
| Estimated Weight: 23700 | Minimum Weight: 1000 | Discount Level: 62% |
| | | Storage Discount: |

Packing Option: ☐ None ☐ Full Pack ☒ Custom Pack     Unpacking Option: ☐ None ☒ Full Unpack ☐ Custom Unpack

| Packing Details | Packing Cont | Per Job Price | Total Price | Unpacking Cont | Per Job Price | Total Price |
|---|---|---|---|---|---|---|
| Dish Pack | 35 | 83.82 | 2933.70 | | 20.96 | |
| 1.5 Ctn | 54 | 20.06 | 1083.24 | | 5.02 | |
| 3.0 Ctn | 18 | 30.36 | 646.30 | | 7.59 | |
| 4.5 Ctn | 8 | 37.01 | 296.08 | | 9.25 | |
| 6.0 Ctn | 5 | 42.33 | 211.65 | | 10.58 | |
| K/G Mtl | 4 | 58.07 | 232.28 | 4 | 14.52 | 58.07 |
| Mirror | 48 | 72.90 | 3499.20 | | 18.21 | |
| Other Ctn | 9 | 31.39 | 201.70 | | 7.83 | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | Total Estimated Pack Charges | | 9084.15 | Total Estimated Unpack | | 58.07 |

| | | Weight | Net Charges |
|---|---|---|---|
| | Packing Services: | | 9084.15 |
| | Unpacking Services: | | 58.07 |
| Transportation Services: | Transportation (T/H): | 23700 | 28401.00 |

**Additional Information:**
Federal regulations require that we provide you with a reasonably accurate estimate of costs. Since neither you nor we are aware of all possible conditions at destination, there are the charges that will be added to the total charges should these services be required.

| Additional Services: | Weight | Net Charges |
|---|---|---|
| Shuttle @ Destination | | 973.94 |
| | | |

| Additional Services: | 8.00% Fuel Surcharge: | 23700 | 2272.68 |
|---|---|---|---|
| | 4.00% Insurance Surcharge: | 23700 | 1136.04 |
| | Origin Service Charge: | 23700 | 815.75 |
| | Destination Service Charge: | 23700 | 1625.19 |

Accessorial Services:
| Orig Shuttle Chgs = Miles: 1: | | 3570.00 |
|---|---|---|
| Dest Extra Stop @ Zip3: 60510: | | 105.57 |
| Crating & Uncrating (see itemized list): | | 863.31 |

| | | |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

| Total Unknown Destination Service Charges | | 973.94 |
|---|---|---|

| NON-BINDING CHARGES: | Valuation Charge: Full Value Protection: Lump Sum $ _____ or $ _____ Per Lb | Weight | Net Charges |
|---|---|---|---|
| | 62% B.L.D. Discount | | -29723.93 |
| | Total Binding Charges: | | 18217.47 |
| | Deductible: ☐ None ☐ $250 ☒ $500 | 23700 | 576.00 |
| | Valuation Charge: 125000 | | |
| | 6 months storage @ Shipworth Moving #1858: | | 2098.20 |
| | Receiving & delivery of req to residence: | | 1697.50 |

NOTE: Under the Assured Price Protection (APP) Program, the APP total charges are compared to the tariff charges for actual weight and services and the lower of the two amounts will be the total charges due. This estimate is based on the method and services listed. The APP total charges shown for this shipment will apply unless additional services are added or additional services are requested and provided; if so, additional charges (bases on the tariff rates in effect on the date of this estimate) will be added to the APP total. This estimate is valid for 60 days from date of customer's signature. All shipments in a state on U.S. funds by cash, postal money order, cashier's or approved personal check payable to Atlas Van Lines, American Express, Carte Blanche, Diners Club, Discover, MasterCard or Visa charge cards.

| Storage-In-Transit Service: | 1st Day Storage: | |
|---|---|---|
| | Additional storage days (days): | |
| | Cartage to/from Warehouse: | |
| | Fuel Surcharge: | |
| | Insurance Surcharge: | |
| | Total Non-Binding Charges: | 4361.70 |
| | **TOTAL CHARGES:** | 22505.17 |

| Johnson & Daly Moving  1228 | | | | |
|---|---|---|---|---|
| Atlas Agent | Agent Code No. | Atlas Rep (Signature) | Date | Customer Signature (To acknowledge receipt only) | Date |